1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )  Case No. 3:13-CR-111-BR
4            Plaintiff,              )
                                     )
5   v.                               )  April 11, 2013
                                     )
6   RICHARD TIETJENS,                )
                                     )
7            Defendant.              )
    ═════════════════════════════════)  Portland, Oregon

8

9                TRANSCRIPT OF PROCEEDINGS

10                  (Detention Hearing)

11     BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

12

13  APPEARANCES:
    FOR THE PLAINTIFF:        JANE SHOEMAKER
14                            Assistant U.S. Attorney
                              U.S. Attorney's Office
15                            1000 SW Third Avenue
                              Portland, OR  97204
16                            (503)727-1000

17

18  FOR THE DEFENDANT:        LISA HAY
                              Assistant Federal Defender
19                            101 SW Main Street, Suite 1700
                              Portland, OR  97204
20                            (503)326-2123

21

22

    COURT REPORTER:           AMANDA M. LeGORE, RDR, FCRR, CRR, CE
23                            U.S. Courthouse
                              1000 SW Third Avenue Rm 301
24                            Portland, OR  97204
                              (503)326-8184

25

```
 1            (Thursday, April 11, 2013; 9:00 a.m.)

 2

 3                    P R O C E E D I N G S

 4

 5        MS. SHOEMAKER:  Good morning, your Honor.  Calling

 6  Case 3:13-CR-111, United States versus Richard Tietjens.

 7        I'm Jane Shoemaker for the United States.  The

 8  defendant is present, in custody, with his attorney Lisa Hay.

 9  And this matter is on for a hearing on defendant's request for

10  a review of the detention order in this case.

11        THE COURT:  So let me tell you, Counsel, what I have

12  and what I've reviewed.

13        I have the April 10 Pretrial Services Office report.

14  I have the bail report that was prepared when the matter was

15  before Judge Papak.  I have the Government's response to the

16  motion in writing.  I have Ms. Hay's memorandum arguing the

17  presumption of detention has been overcome.

18        I'm interested in knowing a little bit more about the

19  concern that was first presented by Judge Papak at the

20  detention hearing that then generated a search of recent

21  computers by the Government.  The notion that the defendant

22  then had computers with this child pornography contraband,

23  accumulated after an initial search back in 2011, as I'm

24  understanding it.

25        What I'm trying to get a handle on is when that first
```

1    search occurred and when the defendant was obviously aware that

2    he was the focus of an investigation, what -- what was conveyed

3    to the defendant about what was going to happen after that

4    search, and was there a reason there wasn't prosecution

5    immediately thereafter?

6         I'm interested in knowing a little bit about that

7    course, and insofar as it might bear on the defendant's mental

8    state and this concern about a compulsion that can't be

9    controlled with conditions of release.

10        MS. SHOEMAKER:  Your Honor, when the police first

11   executed a search warrant at the defendant's residence back in

12   December of 2011, it's my recollection that they told him he

13   was not going to be under arrest at that time.  Of course, they

14   had a search warrant with probable cause.

15        They had just, during the execution of the warrant,

16   seized multiple computers, multiple hard drives attached to

17   them, two servers that were out in the garage.  And they needed

18   to conduct a forensic examination before any decision would be

19   made about pursuing charges in the case.

20        Those servers had over 15 terabytes of storage space

21   on them that had to be searched, in addition to the desktop

22   computer and all of the different hard drives that were

23   attached to them.  I forget now exactly how many hard drives

24   there were, but I believe one of them had eight hard drives

25   attached to it.  And then the forfeiture count lists all of the

1    different ones.  The one server had eight hard drives attached

2    to it.  Another server had six hard drives attached to it.

3    Then there was a desk-type computer that had four hard drives

4    attached to it.

5            And so it took a very long period of time for all of

6    that evidence to be analyzed.  And then it was referred over to

7    our office, and then it took us some time to be able to pursue

8    the charges in this case, just due to other matters that were

9    in the office.

10            So during that period of time, there's one thing that

11    wasn't referenced in the paperwork that I want to bring to the

12    Court's attention.

13            I was talking to the case agent, when we were

14    preparing for the hearing, thinking it was the other day.  And

15    he mentioned to me that the very day after they seized all of

16    the computers from the defendant's residence, back in December

17    of 2011, a police officer went back to the defendant's house

18    the next day -- I believe -- to ask him something.  And he was

19    invited into the house, and he saw, when he went into the

20    house, that there was another homemade computer already built,

21    in the house the very day after the police had seized all of

22    the computers and servers from the defendant's residence the

23    day before.

24            So when -- shortly before the Indictment -- I think

25    it was actually the day before the Indictment was presented to

1    the grand jury in this matter, the police went back to ask the

2    defendant if he would be willing to be interviewed again and

3    asked him for consent to seize the new computers and servers

4    that were at his residence.  And he consented for the police to

5    seize certain of those computers and servers but not to seize

6    other computers that he said belonged to his wife and a

7    computer that was hooked up to their television.

8         And so the police seized those items that day.

9    Which, again, I believe was the day before the Indictment in

10   this case.  And the police had not had time to look at those

11   devices, to search them prior to the defendant's initial

12   appearance in this case.

13        He did tell the police in that interview, when he

14   consented to the seizure of those additional devices, that

15   there shouldn't be any child pornography on these computers

16   now; suggesting that he wasn't still engaged in this activity.

17        So when we had the hearing in front of Judge Papak,

18   he indicated -- and when I was arguing about the risk of the

19   defendant's danger to the community based not only on the

20   presumption but on the volume of child pornography the

21   defendant had amassed, which obviously would be something that

22   would take a very long period of time -- likely years for him

23   to collect -- that we were concerned.  And once again, having

24   all of these computers and servers configured in the same way

25   as the ones that were seized in December of 2011.  So we were

1    concerned that the defendant was still engaged in these

2    offenses.

3           And Magistrate Judge Papak said that if there were

4    evidence that the defendant was still engaged in this activity,

5    if there was more child pornography on these new devices, then

6    he would agree with us and be inclined to detain him.  So he

7    asked us how long it would take to search them or why they

8    hadn't been searched yet.  And we said there simply hadn't been

9    time to search them.  I didn't know how long it would take, but

10   that if we could have a three-day continuance that we were

11   entitled to under the statute, that we could attempt to examine

12   at least some of the devices for a continued detention hearing.

13          So we obtained that continuance, and over the weekend

14   the agent attempted to image and search the devices that the

15   defendant had consented to, to see if there was any child

16   pornography.

17          Once again, the devices contained terabytes of

18   storage space.

19          So the case agent told me that -- I don't have the

20   notes of my conversation right there, but I believe I

21   referenced it in our response.  I believe he said that it was

22   going to take at least a week just to do -- to image the

23   devices and likely take months to search them all.  But he was

24   able to -- scratching the surface of the desktop computer, he

25   did locate a file that was -- I believe it was call "young,"

1    that contained images of child pornography in it.  And he also

2    saw that there were stories in there about -- it was an incest

3    theme of children and their father engaged in sexual activity.

4    And there was, I believe, a chat where he told somebody that

5    he's attracted to girls that would be the age of his children

6    or grandchildren.

7         And so the agent didn't continue looking once he

8    found a file that did have child pornography on it.  And, of

9    course, as I said, it was just scratching the surface, and

10   there was no way that he was going to be able to conduct a

11   thorough examination of that before the detention hearing.

12        So when we returned on the following Monday and had

13   the continued detention hearing with Judge Papak and told him

14   about that evidence, Judge Papak agreed that the defendant is a

15   danger to the community and ordered him detained.

16        And so after that hearing, the defendant revoked his

17   consent, and so the Government has not conducted any further

18   search of those devices at this time.  And we may apply for a

19   warrant.  We're in negotiations right now, and so it will just

20   depend on what happens with that.  But, essentially, that's

21   what the circumstances are.

22        So what we're talking about here is, first, the

23   seizure in December of 2011 that involved two servers with over

24   15 -- or approximately 15 terabytes of storage information.

25   One of those servers had on it an application -- a peer-to-peer

1   application, where the defendant was able to download and make

2   available for others to obtain from him images of child

3   pornography.

4           There were also thousands of images and videos of

5   child pornography stored on those servers.  The defendant

6   admitted in a later interview -- and the police could tell from

7   their examination of it -- that it appeared other people were

8   storing their child pornography on his servers as well.  At

9   least one other woman.

10          In addition, the police obtained a search warrant and

11  the defendant's consent to search his e-mail account.  The

12  daddy_mystery@yahoo.com.

13          And from the e-mails that were available on that

14  e-mail account, we learned that the defendant was actively

15  trading child pornography with another -- a number of other

16  Yahoo e-mail account holders.

17          THE COURT:  As -- as of when?

18          MS. SHOEMAKER:  Well, the dates that were available

19  from the information we obtained from Yahoo for that search

20  warrant include the dates that are in the Indictment that would

21  include from July of 2011 through (pause, referring) August of

22  2011.  And those were with several different individuals,

23  including an e-mail account identified as k_waters55@yahoo.com.

24  Another one lococigar69@yahoo.com, popfortots69@yahoo.com, and

25  momknowsbest69@yahoo.com.

1          And those e-mail accounts showed that the defendant

2    was trading.  Sometimes he was -- he was saying something to

3    the effect of, you know, I'll give you this if you give me

4    that.  Other times, he was receiving images or videos of child

5    pornography from these other individuals.  And in many of the

6    e-mails he was providing videos and images of child pornography

7    to the other individuals.

8          THE COURT:  So -- so clarify for me, please.  To what

9    extent is this data, data to which the defendant accessed after

10   the search warrants versus before?

11         MS. SHOEMAKER:  The only thing I can say about what

12   he did afterwards, based on what the agent was able to do over

13   that one weekend, was to show that he had viewed -- he had a

14   folder on his desktop computer that had in it -- I believe it

15   was titled -- if I can just have one moment here to look.

16         (Pause, referring.)

17         MS. SHOEMAKER:  Here it is, your Honor.

18         Where they found a file on his desktop entitled

19   "youngsters," that contained images of child pornography.  And

20   it showed that it had been accessed in November of 2013 and

21   again in January of 2013.

22         MS. HAY:  That would be November of 2012.

23         MS. SHOEMAKER:  I'm sorry.  It should be November

24   2012.  That's a typographical error there.  And January of

25   2013.

1          So without having been able to search further at this

2    point, we can't say exactly what the defendant was doing

3    between December of 2011 and November of 2012, other than he

4    had built and obtained two new servers and another desktop

5    computer that were configured the same way as the other servers

6    and computers that he had, with multiple hard drives attached

7    to them, with -- again -- terabytes of storage space.  And

8    we're finding the stories about incest, statements to somebody

9    in a chat about being attracted to girls who are the age of

10   what would be grandchildren or children, and this file that we

11   found.

12          I think the fact that he had thousands of videos and

13   thousands of images of child pornography stored on all of these

14   different devices; that he was engaged in active trading with

15   other individuals, not just collecting the child pornography

16   himself, exacerbates it and shows that he has a very strong

17   sexual interest in children.  That he's been doing this for a

18   very long period of time.  This is not something -- you cannot

19   amass collections like that overnight.  This is something that

20   would have taken a long time.

21          Some of the e-mails that he had, that were on the

22   Yahoo e-mail account, that were seized back in December of

23   2011, there were conversations with him with, for example, the

24   individual identified -- or using the -- the e-mail account

25   lococigar69@yahoo.com.  I believe that's the same person who

1    later changed the e-mail to popfortots69@yahoo.com.  This is a

2    person who claimed to be sexually abusing his young

3    granddaughter and producing his own child pornography.  That

4    the defendant was seeking images of that sexual abuse from the

5    individual using these two Yahoo e-mail accounts, lococigar69,

6    and popfortots69.

7            The police later did an investigation and identified

8    who that individual was, and learned in fact he was not in fact

9    abusing a granddaughter but was getting the images somewhere

10    else.  But he was claiming that he was abusing his

11    granddaughter.  And this defendant, in those e-mails, was

12    encouraging that individual to sexually abuse the grandchild

13    and send him more videos and pictures of it.

14            He was also talking to -- I believe it was the

15    momknowsbest e-mail account, momknowsbest69@yahoo.com, where --

16    it was either her or it was the K_Waters e-mail account, where

17    he was talking to the woman with her having her, I believe, son

18    and daughter engage in sexual activity together.  That he

19    wanted images of that.

20            And so this evidence -- the fact that he's amassed

21    this collection, that he has this volume of space on his

22    servers and his computers, where he's got the peer-to-peer

23    network application that allows him to not only download but to

24    share his stuff, and he was actively sharing through e-mail and

25    instant messenger the child pornography over this period of

1   time, and he continues to engage in this conduct even after he

2   knows that he's the subject of a law enforcement investigation,

3   shows that he is addicted to child pornography and that he is

4   not going to be able to stop collecting and/or trading child

5   pornography in this case.

6           He's obviously highly skilled and sophisticated

7   technologically, to the point that he can build his own

8   computers, build his own servers.  He could circumvent, I

9   think, any sort of monitoring equipment that might be put on

10  his wife's computer, if she were allowed to maintain computers

11  in the house, or to get through the passwords.  He could

12  obviously build new computers or new servers.  He could

13  potentially be using or hacking into his neighbor's computers,

14  using library computers.  There are just so many different ways

15  a person like this, with these skills, could circumvent any

16  order if the Court were to release him on conditions in this

17  case and continue to access child pornography and potentially

18  trade child pornography with other individuals.

19          Congress has said that these child pornography

20  offenses are crimes of violence.  That's defined under Title

21  18, Section 3156(a)(4).  And, as a result, there is a

22  rebuttable presumption that the defendant is a flight risk and

23  a danger to the community.

24          I think the fact that he has lived in the

25  community -- he's -- he's got a wife and he's got his home and

1    he previously was employed, and all of that, and the fact that

2    he didn't flee after becoming aware of the investigation, I'm

3    not advancing that argument.  I -- I don't think that he's

4    going to flee.  But I do think that he's a danger to the

5    community, and I do think that the presumption has not been

6    rebutted in this case.

7           I just don't think with a guy like this, who's been

8    collecting child pornography and actively trading it this long,

9    even after he knew he was the subject of an investigation, and

10   with his skills, I just don't think there's any way that we can

11   be reasonably assured that he is not going to continue to

12   engage in these crimes which Congress has defined as crimes of

13   violence.

14          He's a danger to the community.  He's got a strong

15   sexual interest in children, and that is a danger to the

16   community.

17          THE COURT:  Thank you, Ms. Shoemaker.

18          Ms. Hay.

19          MS. HAY:  Thank you, your Honor.

20          I think you identified exactly the -- the question

21   that we should be focusing on, which is what is different from

22   December of 2011 and today.

23          I think the facts in this case, of course, are based

24   on the Government's allegations, and we need to review all of

25   it.  But -- and the Court understands that the nature of the

1    offense is the least important factor when deciding

2    dangerousness, but there is the presumption.

3            I did want to point out, your Honor, that the

4    presumption that's listed in 3142 for certain offenses that

5    involve minors includes the transportation -- or the

6    transmission of child pornography but many of the other

7    offenses are in the range of actual minors being harmed in

8    person by this defendant, meaning kidnapping, sex trafficking

9    of children, aggravated sexual abuse.

10           These are all of the offenses that are listed under

11   3142.  Let's see.  What is the -- little (e) -- (d)(e).  And

12   the transportation -- or transmission of child pornography is

13   one of the cases in which there's a presumption.

14           But possession of child pornography is not one of

15   cases in which the presumption is listed in the -- in the

16   Statute 3142.

17           So, to me, I think what's different here is that the

18   presumption applied to the offenses that this defendant was

19   charged with committing as of December 2011; that he was

20   transferring/transmitting child pornography.

21           What I understand happened -- and this is from the

22   Government's discovery and some other conversations, is that

23   they went to his home with a search warrant.  They told him

24   that he wasn't going to be arrested now but that they had a

25   search warrant.  They could have arrested him.  And that they

1    were going to go and review all of these computers.

2            I do not believe they took all of the computers from

3    the home at the time.  He had partial computers and pieces of

4    computers.

5            As your Honor can understand, he's a -- his hobby is

6    computers.  That was his -- his job was working on computers,

7    and that's the love of his -- you know, what he spends all of

8    his time doing, is working on computers, building them, fixing

9    them for others, creating them out of junk that he finds.

10   That's what he does.

11           I think what the Government hasn't told you is that

12   among all of these terabytes of information on the computers

13   are also zillions of ordinary movies, music, videos, things

14   that are not pornographic.

15           So he has a lot of storage space on computers.  He

16   downloads a lot of things from the Internet.  Not all of it is

17   child pornography.  There's no doubt, as they said, there's a

18   lot of that in the discovery, is what they're telling us,

19   but --

20           THE COURT:  Can you slow down just a touch, please,

21   Ms. Hay.

22           MS. HAY:  Sure.

23           He has an interest in computers.  He knows how to

24   build them.  Nobody told him, when he was talking to the police

25   in December of 2011, that he couldn't have computers.

1          So the fact that he then went and built more isn't

2   evidence --

3          THE COURT:  It's not that he built more computers,

4   Ms. Hay.  It's the concern that -- that there seems to be

5   evidence that he acquired more child pornography and may have

6   actually transmitted more child pornography.  It's hard to

7   tell.

8          MS. HAY:  So I guess -- that's what I don't -- your

9   Honor, I don't know that there's an agreement on that.

10          I think the evidence is they found a file on his --

11   on his desktop that had a name referring to child pornography

12   and included child pornography in it.  But I don't know if that

13   is a file that is leftover from a hard drive that the agents

14   did not take --

15          THE COURT:  And I don't know that it isn't.

16          MS. HAY:  Right.

17          THE COURT:  When I'm dealing with a presumption of

18   detention, there has to be a rational, nonspeculative factual

19   basis for me to conclude the presumption has been overcome.

20          I think what's of concern here, legitimately, is that

21   the -- that your client is not the ordinary, unsophisticated

22   person accused of child pornography crimes.

23          MS. HAY:  Yes.

24          THE COURT:  And so this argument that he continues to

25   present as a danger to the community derives from his

1    special -- specialized expertise and a reasonable inference,

2    the Government is asserting, that he is not able -- even if he

3    was intellectually willing -- to resist the impulse to continue

4    to engage in the -- the -- and each -- each act of viewing

5    child pornography anew, that he would be likely to engage in --

6    says the Government because he can't be guaranteed not to

7    access child pornography -- would be yet another victimization

8    in contravention of the presumption.

9         So this is not a man who is your ordinary guy who

10   just knows how to use an iPhone or some device, and I -- I

11   think the Government's argument is legitimate.

12        MS. HAY:  And, your Honor, I agree it's not an

13   ordinary case.  But I think the difference on the information

14   that was discovered on -- on the second time they came to the

15   house -- first, I want to just point out that the Government

16   did have information about him.  December 2011 is when they --

17   they seized the computers.

18        The Government has told us that they did get the

19   information about what was on the computers, and that due to

20   other matters in their office, they didn't feel at that point

21   there was a danger and they needed to go arrest this defendant.

22   They let it slide for a while.

23        So the fact that there was so much information on his

24   computer, that he was trading, that they knew about these

25   e-mail accounts, they knew about the lococigar69 chats with

1    somebody, all of that they knew and they didn't go arrest him

2    immediately.  They said other things were happening in the

3    office.  They waited.  So I think that weighs against a sense

4    that this is -- that based on all of that knowledge, and all of

5    those things that he had, shows that he's a danger.

6              I think that the issue is simply what -- what about

7    when they came back and there were more computers and more

8    child pornography --

9              THE COURT:  So what are you proposing specifically

10   that would be a factual basis from which I could conclude

11   rationally that there is not a risk the defendant will continue

12   to amass, access, or otherwise engage in child pornography

13   crimes if he was released?

14             MS. HAY:  Your Honor, I think there's two bases for

15   that.  First is when the officers contacted him again --

16   contacted him again in 2013 and asked him if he would be

17   willing to come to their office for additional interviews, he

18   was willing to do that.

19             He's cooperated every time they've come to talk with

20   him.  So I believe he's doing his part in following --

21   following requests.

22             THE COURT:  He cooperated earlier but --

23             MS. HAY:  In 2011.

24             THE COURT:  Counsel says he's revoked consent to

25   search.  Is that accurate?

1          MS. HAY:  Your Honor -- yes, that was through me,

2   your Honor.  That's simply -- I hadn't seen the discovery at

3   that point.  I wanted to make sure I understood if there was a

4   legal basis --

5          THE COURT:  I'm not being critical.  I'm just trying

6   to be complete here.

7          MS. HAY:  Right.  Yes.

8          THE COURT:  So he cooperated earlier.

9          Go ahead.

10          MS. HAY:  And they asked him to come to meet with

11   them.  He went to the police station.  He talked with them some

12   more.  He then agreed that they could take the computers and --

13   that were in his house, that he had again built.

14          As the Government's memo points out, it is a homemade

15   computer, made with pieces that he put together.  I think there

16   is a factual question on when that information was put onto his

17   computer, that child pornography that they're saying was there.

18          The Government has given us an access date of 2012

19   and January 2013, but that's not the creation date.  That's

20   simply, for example, when the file might have been moved.

21          So I haven't seen the information enough to know

22   whether he's actually gone onto the Internet and downloaded

23   masses of child pornography again.

24          Mr. Tietjens told the agents he didn't think there

25   would be child pornography on those computers.

1          So I think there's a question here about how much

2    actually is on the computers now.

3          THE COURT:  But when you have the burden and the

4    presumption exists, I can't ignore what is, I think, a rational

5    concern.

6          Proposing that the defendant be released to his home

7    doesn't really provide any kind of meaningful assurance that

8    between his compulsion -- which I presume for purposes of this

9    hearing but not for purposes of his ultimate culpability -- and

10   his talent, that there does not seem to be a reasonable basis

11   to think that's wise.  That -- that there is, in other words, a

12   likelihood this behavior will recur in that setting.

13          I -- I can't draw any other conclusion on the record

14   I have.

15          MS. HAY:  Your Honor, I think what I could offer,

16   then, is we have his wife available by phone.

17          I did put some brief parts --

18          THE COURT:  It's not about the wife, Ms. Hay.  It's

19   about him.

20          MS. HAY:  About what would be available in the home.

21   That he previously --

22          THE COURT:  That's not the problem.

23          The -- if -- if we knew that electronic access was

24   confinable to a geographic space, if I had any confidence that

25   an order telling him not to do this would be honored, we'd have

1   something to talk about.

2          But the premise the Government's proceeding on is a

3   reasonable one.  That is that the sheer volume of contraband

4   the defendant amassed up to 2011; the fact that after computers

5   were seized, more pornography was found -- and I don't know if

6   it was before or after, but I can't assume latter -- I mean,

7   the former.

8          The fact that he has the talent that he has, I know

9   that those with those kinds of talents can access electronic

10  data in a variety of ways:  Through a television monitor,

11  through somebody's Play Station machine, somebody's home.

12  There are -- there are countless ways a person with talent can

13  get into the Internet, even if his wife doesn't have a computer

14  in the room, even if he promises he won't do this.

15         So what you're proposing to me is not a sufficient

16  basis for me to have any confidence that I can release him to

17  the home and expect he won't somehow manage to feed what seems

18  like a compulsive behavior.  Again, for purposes of this

19  hearing and not for purposes of other issues.

20         So I don't think the presumption has been overcome

21  with respect to the fact that the defendant -- defendant's past

22  behavior and his behavior up to the time of his arrest suggests

23  he's likely to reengage in this behavior, despite an order to

24  the contrary and the relatively unsophisticated means the Court

25  has to enforce this kind of condition.

1           I'm open to reconsidering this if you can put

2   together something that allows me to draw an inference that

3   there is a very good likelihood the defendant won't access or

4   transmit pornography if he's released.  Won't have access to

5   any computer.

6           You didn't propose, for example, a placement in a

7   reentry center where his physical whereabouts will be

8   monitored.  I just can't see the defendant in his home, with

9   the talents he has, and a simple "Don't do this" order from me

10  as enough.  So this record --

11          MS. HAY:  Yes, your Honor --

12          THE COURT:  -- can't get me to that place.

13          MS. HAY:  So I'm trying to think of what I can come

14  up with as an alternative.

15          THE COURT:  I don't know that you can, Ms. Hay.  What

16  I am saying is this record doesn't support a finding that

17  you've overcome the presumption.

18          MS. HAY:  May I propose some other conditions, your

19  Honor, that might -- I mean, what I'm trying to understand --

20  it sounds to me like it's -- the Government's argument is that

21  there is an addiction here that can't be overcome.  And if it

22  were a drug addiction, we would put him in a drug treatment

23  facility.

24          I'm trying to think.  If this is an addiction to

25  accessing child pornography --

1        THE COURT:  Well, the only way I know of for certain,

2   to keep him out of the computer, is in the custody of the

3   United States Marshal.

4        If you can conceive of and rationally demonstrate

5   something that's as secure, then I'm happy to hear about it.

6   But I don't want to speculate.

7        MS. HAY:  So I don't want to waste Pretrial's time.

8        May I suggest something, your Honor, that -- possibly

9   what I would want to propose is that we have Pretrial Services

10  and I could go out to the residence to take out --

11       THE COURT:  He's not going home.  That is just not a

12  secure situation.

13       I do not have confidence that a person with his

14  talent, in a residence, with a wife who's ill, is going to be

15  able to be trusted not to do this.  That's just going to

16  happen.

17       So he stays in custody because I know the likelihood

18  is less he will have access to a computer.  I'm not so naive as

19  to conclude there aren't some opportunities.  But that's one

20  where I know there won't be a risk of reoffending.

21       You -- you would need to present something like that.

22  Some alternative where he's not going to be on his own and

23  accessing, through his considerable talents -- having the

24  opportunity to access, through his considerable talents, what

25  seems like a serious problem.

1          So I'm denying the motion to -- well, I granted the

2    Motion to Review Detention in that I've reviewed it, but I'm

3    concluding that the rebuttable presumption has not been

4    overcome with respect to danger to the community.

5          I appreciate the Government's concession that the

6    defendant is not a likely flight risk.  That's not the issue

7    here.

8          So, now, why don't we talk a bit about dates, while I

9    have you here.

10          What was the trial date set by the magistrate judge?

11          MS. SHOEMAKER:  May 14th.

12          THE COURT:  Okay.  Are you going to be ready for

13    trial May 14th?

14          MS. HAY:  Your Honor, we would not be.  We haven't

15    been able to review the computers.  I'm wondering if maybe we

16    should have this declared a complex case, given the nature of

17    the 15 terabytes and however many hard drives and others that I

18    would need an expert to review, especially because the -- the

19    weight that the Court's putting on the later-seized computers,

20    I would want to make sure I look at those.

21          THE COURT:  Ms. Hay, please understand me.

22          I fully presume your client to be innocent in terms

23    of his ultimate culpability.

24          My duty today is to determine whether a rebuttable

25    presumption, based on what you've all brought to me, has been

1   overcome, and it hasn't.

2         I'm concerned that releasing the defendant, in any

3   event, would be unwise.  He's staying in custody.

4         Let's -- let's develop a plan and get this issue

5   resolved on its merits as soon as reasonably possible.

6         I appreciate you can't be ready for trial in May.

7         Have you had an opportunity to speak with your client

8   about his speedy trial rights and what you would be suggesting,

9   in terms of me?

10        Do you want an opportunity to talk with him right

11  now, before we --

12        MS. HAY:  I did talk to him, your Honor, and let him

13  know that given the number of computers the Government's

14  referred to and the storage on them, that I would consider it

15  complex and would need more time.  And he agreed that we

16  could -- I could ask for additional time, if needed.

17        THE COURT:  Well, let's find a trial date now,

18  recognizing that May is not going to be soon enough.

19        What's the Government's thought in terms of time it

20  can be ready and it reasonably can produce discovery to the

21  defendant so he can be ready?

22        You need to know that recently this week, in -- in

23  our judges' meeting, we were presented with arguments by the

24  United States Attorney and the Federal Defender, himself,

25  concerning continuances and the time it takes.  And the issue

1    of the ability to have cases tried within a certain time frame

2    was tied directly to the time it takes the Government, in one

3    case or another, to produce the discovery.

4          So the sooner the Government can pony up what it

5    knows it has to and give the defendant a reasonable amount of

6    time to assess it, the sooner we can push.  But that tension is

7    being brought to us, as -- as a board of judges, from your

8    respective offices.  And I certainly have my own concerns about

9    how long it takes to get matters to trial.  And the defendant's

10   in custody, so we need to move reasonably.

11         What are you thinking?

12         MS. SHOEMAKER:  Your Honor, we did provide discovery

13   to the defense on March 28th, in accordance with the

14   magistrate's order at the initial appearance, to provide

15   discovery within 14 days.

16         And, of course, that doesn't include the images of

17   child pornography themselves.  But we did make known to Ms. Hay

18   that she can contact the case agent to make arrangements for

19   herself and/or an expert to go view that material at the

20   Newberg/Dundee Police Department.

21         There -- as -- in most cases, we usually wind up

22   having some additional discovery, as we go through ours and are

23   preparing for trial, realizing there's additional stuff that

24   needs to be produced, and I'll obviously need to do that.

25         But I believe that the discovery has been provided in

1    this case.  It's really just a matter of the seizure of the

2    computers and the forensic examination.  And this is not a case

3    that's based on, you know, cooperating witnesses, or anything

4    like that, where we have other things outside of the case to be

5    looking at.

6           So I think, you know, we'll make ourselves ready for

7    trial whenever the defense is ready.

8           I -- I don't think that just because there's a

9    significant volume of material here, that that necessarily

10   makes it a complex case.

11          It's -- we really only need to have one image of

12   child pornography for the possession count.  And --

13          THE COURT:  You may only need one image, but the

14   defense needs a fair opportunity to evaluate the majority, at

15   least, of the Government's evidence to determine whether there

16   are any other issues that are important for the defense to

17   raise.

18          So it isn't just the Government's need.  It's -- it's

19   what the defense needs reasonably to provide effective

20   assistance of counsel and evaluate all of the exposures, and so

21   forth.  To characterize what's there, relative to the mandatory

22   minimum offense charge versus other matters, to fully advise

23   the defendant -- you know, we can't expect Ms. Hay to simply go

24   to trial on one image.  That's --

25          MS. SHOEMAKER:  And I don't mean to suggest that.

1    I'm sorry, your Honor.  I didn't mean to give that impression.

2    All I'm saying is that although there's 15 terabytes of storage

3    space, I don't think that it necessarily requires a review of

4    every single thing that's on those devices.  And if they needed

5    to do that --

6                THE COURT:  So give me a suggestion as to when you

7    believe I should set the trial date.

8                MS. SHOEMAKER:  Well, I don't know what the defense

9    expert's timing is going to be, but --

10               THE COURT:  Ms. Hay, what are you proposing?

11               MS. HAY:  Your Honor, I guess if it's set in May now,

12   I would think at least we would need until July for a trial

13   date.

14               THE COURT:  Let's look into the first week of August.

15               Do you have your calendar?

16               MS. HAY:  I do.

17               THE COURT:  And do you?

18               MS. SHOEMAKER:  I don't, but we can set it for --

19               THE COURT:  So let me suggest that we also set the

20   trial on Monday and not Tuesday.

21               You may know that as a result of the furlough issues,

22   we've been asked not to have criminal proceedings on Fridays.

23   And so the idea of starting a trial on a Tuesday, only to

24   adjourn on a Friday, seems not very efficient to me.

25               So we -- I could propose to you Monday, August 5;

1  Monday, August 12.

2          MS. HAY:  Those are all fine with me, your Honor.

3  And I also am furloughed on all of those Fridays.  But -- but

4  we could set the trial then anyway.

5          THE COURT:  Okay.  And do you expect,

6  Ms. Shoemaker -- how long for trial?

7          MS. SHOEMAKER:  Three days, your Honor.

8          THE COURT:  Let's set it for Monday, August 5, at

9  nine o'clock for jury selection.  Set a pretrial conference in

10  the preceding week, Wednesday, August 31, at nine o'clock.  I'm

11  sorry, July 31, at nine o'clock, for the pretrial conference.

12          So papers to prepare me for that will be due July 15.

13  And, here, I mean your jointly proposed elements, jury

14  instructions, and on any substantive matter for which the

15  defendant may be assuming the burden of proof.  I don't know

16  where we're going with this, so just the elements instructions

17  and any burden of proof issues.  Trial memoranda, motions in

18  limine, the Government's exhibit lists, the Government's

19  witness list.  And then notations on both as to whether any of

20  the proposed witnesses or any of the proposed exhibits are the

21  subject of objections.

22          And then motions in limine and supporting legal

23  argument as to those objections, or any other evidentiary

24  issues you need me to raise -- or to resolve.

25          Do you anticipate, Ms. Hay, based on what you know

1   now, any evidentiary -- the need for me to schedule any

2   evidentiary pretrial motions, Motions to Suppress, or so forth?

3          MS. HAY:  I asked the Government to provide signed

4   copies of the search warrants.  I don't have those yet, your

5   Honor.  I would need to review that.  But that would be the

6   issue that I could see as a possible suppression issue.

7          THE COURT:  Okay.  So let me give you a deadline for

8   the filing of any of those motions.

9          Give me just a moment, please.

10          (Pause, referring.)

11          THE COURT:  Ms. Shoemaker, how long do you think that

12   Senator case will actually take to try?

13          MS. SHOEMAKER:  I believe the Thursday of the second

14   week, potentially, your Honor.  We're still hoping that it will

15   be maybe the Tuesday or Wednesday.  But it could go that

16   Thursday.

17          THE COURT:  (Pause, referring.)

18          Okay.  If there are any motions to suppress or other

19   pretrial matters on which I need to conduct an evidentiary

20   hearing, the hearing will happen on Monday, July 8, at ten

21   o'clock.

22          And for that then to happen, the motion needs to be

23   filed no later than June 14, and any responsive memoranda filed

24   no later than June 28.  And then we'll take the evidence at the

25   hearing on July 8.  And in a perfect world, I can make findings

1    of fact and conclusions of law at the conclusion of the

2    hearing.  And if I can't, then I'll write them out.  That would

3    still leave us with enough time to go to trial on August 5.

4                In the meantime, just to ensure we're making progress

5    toward the August 5 trial date, I would like a joint status

6    report from the parties May 17.  Just a joint report from

7    counsel, indicating the progress you're making, identifying

8    whether there's any need for me to convene some kind of

9    proceeding to help resolve and move you along toward the August

10   5 trial.  So just a joint status report.

11               And then if there are any other issues that come up,

12   of course you'll let me know, and I will deal with them.

13               I am finding excludable delay through the ends of

14   justice exception to the Speedy Trial Act through August 5.  I

15   don't think it's necessary to make a complex case finding at

16   the moment.  I'm satisfied any responsible lawyer would need

17   the time I'm allowing now adequately to be prepared to review

18   the defensive issues, to engage in discussions with the

19   Government, and so forth.  So that's your new trial date.

20               Are there other matters, Ms. Shoemaker, you want me

21   to address while we're still together?

22               MS. SHOEMAKER:  I don't believe so, your Honor.

23   Thank you.

24               THE COURT:  Ms. Hay?

25               MS. HAY:  No.  Nothing else.  Thank you, your Honor.

1          THE COURT:  All right.  Thank you, everybody.  We're

2     in recess on this matter.

3               (Conclusion of proceedings.)

4

5                              --oOo--

6

7     I certify, by signing below, that the foregoing is a correct

8     transcript of the oral proceedings had in the above-entitled

9     matter this 10th day of January, 2014.  A transcript without an

10    original signature or conformed signature is not certified.  I

11    further certify that the transcript fees and format comply with

12    those prescribed by the Court and the Judicial Conference of

13    the United States.

14

              /S/ Amanda M. LeGore

15          _____

16             AMANDA M. LeGORE, RDR, CRR, FCRR, CE

17

18

19

20

21

22

23

24

25